


911 Main Street, Suite 2800
Kansas City, Missouri 64105
816.421.4460 F: 816.474.3447
www.seigfreidbingham.com

Lance Formwalt
816.265.4106
lancef@seigfreidbingham.com

April 11, 2014

**Via Email and First Class Mail**
Wendy K. Marsh
Nyemaster Goode, P.C.
700 Walnut, Suite 1600
Des Moines, IA 50309
Email: wkmarsh@nyemaster.com

Re: Dairyland Midwest Inc. d/b/a DMI Computer Technologies (AgVision mark)
Agrivision Group, LLC (AgriVision mark)

Dear Ms. Marsh:

I understand that you have had some initial discussions with Rush Nigut at Brick Gentry, P.C. relative to your representation of Dairyland Midwest Inc. d/b/a DMI Computer Technologies ("DMI") and its AgVision trademark and allegations of trademark infringement by our client AgriVision Group, LLC (the "Dealership"). At this point, our firm has been engaged by the Dealership to represent it in formally responding to your correspondence to date.

We have reviewed your arguments that the Dealership's adoption and use of its AgriVision trademark (the "AgriVision Mark") infringes on DMI's AgVision mark (the "AgVision Mark"). For the reasons stated below, we strongly disagree with your conclusions. The AgriVision Mark is not confusingly similar to the AgVision Mark and will not cause customer confusion. Accordingly, the Dealership will continue to use the AgriVision Mark and prosecute its trademark applications.

As stated in your most recent correspondence, the Eighth Circuit applies the six factor *Squirtco* test when making a determination of likelihood of confusion. We have applied the facts of this situation to each of these factors and summarized our conclusions below. Each factor weighs in favor of finding no likelihood of confusion.

First Factor. The first factor is whether the mark is a strong and distinctive or weak mark. If the mark is strong and distinctive, it will be afforded greater protection. On the other hand,"[w]here a party chooses a trademark which is inherently weak, [it] will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, [its] competitors may come closer to [its] mark than would be the case with a strong mark without violating [its] rights." See *Sure-Fit Products Co. v. Saltzson Drapery Co.*, 254 F.2d 158






(C.C.P.A. 1958). Further, see *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622 (8th Cir. 1987) noting that the determination "that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related".

In this case, the AgVision mark is not a strong and distinctive mark, but rather is a weak mark in part because there are other businesses using the same mark for goods and services in the agricultural field. Specifically, Northwest Farm Credit Services was allowed to register and obtain a federal trademark for AgVision (RN 2845369, registered May 25, 2004) with the USPTO for various services, including agricultural loans, equipment and machinery loans, loan services for direct suppliers and lenders of agricultural products, and leasing of equipment, machinery and vehicles used for agricultural operations. See also its website located at https://www.northwestfcs.com/Products-and-Services/Young-Beginning. In addition, there are other unregistered uses of the AgVision mark or trade name related to the agricultural industry, including (1) AgVision Seeds Ltd. – seed company in Canada (http://www.agvision.ca/aboutus.html), (2) AgVision TV - develops television quality video business case studies that demonstrate timely management concepts that can be adopted by a broad section of producers (http://agvisiontv.com/), (3) Agvision – channel on YouTube discussing agricultural issues (https://www.youtube.com/user/AgVisionTV) and (4) AgVision software used by AgriLogic Insurance Services, LLC related to crop insurance and related services for agriculture clients (http://www.agrilogic.com/index.php/home/resources/198-agvision).

Further, the USPTO has allowed the following marks to be registered for varying types of goods or services in the agricultural field during coinciding dates. This evidence shows that the USPTO finds marks using "Ag" and Agri" with the same or similar combined words to be weak marks. Accordingly, the USPTO has allowed for the registration of those marks for differing goods and services in the agricultural industry.

1. (i) DMI's AgVision Mark (registered August 8, 2000 to date for "computer software and hardware for managing information and products at agribusinesses such as grain elevators, feed stores, fertilizer companies, farmers, and cooperatives") and (ii) AgVision mark (registered May 25, 2004 to date by Northwest Farm Credit Services for the goods and services noted above);
2. (i) AgriVisions mark registered by First Dakota Financial Corporation (RN 3954586 registered May 3, 2011 to date for "printed matter, namely, newsletters, brochures, and informational pieces in the fields of finance, banking and agriculture") and (RN 3426823 registered from May 13, 2008 to date for "education and entertainment services in the nature of a radio program and conferences in the field of agriculture and rural life"); https://www.firstdakota.com/AgricultureBanking.aspx (both marks were allowed to register despite registration of the AgVision marks noted in 1 above).





3. (i) AgriVisions word mark (RN 2109061 now cancelled but was registered from October 28, 1997 to July 31, 2004 by Harvest States Cooperatives for "publications, namely, magazines relating to agricultural topics") (time of registration also overlaps with the AgVision Mark of DMI) and (ii) Agri Vision word mark (RN 1678934 now cancelled but was registered from March 10, 1992 to September 14, 1998 by Agri Vision Inc. for "private label supplying of animal feed and supplements to others").
4. (i) Agrivision word mark (RN 2806380 now cancelled but was registered from January 20, 2004 to August 27, 2010 to Dale Heikes for "video cassette, DVD, CD-ROM, and television production services"; agriculture-related example of use filed) and (ii) allowed to register despite registration of the AgVision Mark of DMI and prior AgriVisions mark (RN 2109061).
5. (i) AGDATA mark (RN 2088657 registered on August 19, 1997 to date by AGDATA, L.P. for "marketing services, namely, data segmentation and data regression analysis services; marketing database compilation, design and analysis services; management services in the area of rebate and incentive payment programs; market research services; and marketing and business management consulting services"; http://www.agdata.net/about) and (ii) Agri-Data mark (SN 85663816, Notice of Allowance issued May 21, 2013 by Agri-Trend Data Corp. for "computer software for use in the field of business management, namely, for managing and analyzing crop and field conditions and optimal crop yield, and for business administration in the nature of assisting in decision-making in commodity marketing and consulting services in the field of commodity marketing and consulting services in the field of agricultural commodity marketing, namely, grain and crop marketing"; http://www.agri-data.net/www);
6. (i) MyAgData mark (Reg. Nos. 4456347 and 4456344 registered on December 24, 2013 to date by Independent Data Management, LLC for "computer software and software as a service (SAAS) for storing, processing and sharing precision farming data and manually entered data required for reporting and record keeping"; http://www.myagdata.com/about) and (ii) Agri-Data Management mark (RN 2456576 registered on June 5, 2001 to date by TSM Services, Inc. for "agricultural consulting services, namely, training growers and fertilizer dealers to make practical and profitable use of precision agricultural concepts utilizing global positioning satellite and global imaging satellite technology"; http://www.tsmser.com/ADM/admhome.htm).

Because the AgVision Mark is used by other businesses in the agriculture industry and because the mark begins with "Ag" to denote that the company has some nexus to agriculture goods or services (an initial prefix or syllable which is used by numerous other businesses in the agriculture industry), the mark is a weak mark. Due to the fact that it is a weak mark, customers will recognize and look for and pay attention to variations and differences in use of the AgVision Mark and other marks, and businesses with agriculture-related goods and services are able to adopt and use similar marks.






Factor Two. The second factor is the degree of similarity between the two marks. When assessing this factor, courts typically evaluate the appearance, sound and overall commercial impression. In this case, the AgVision Mark and AgriVision Mark differ in direct appearance in the addition of the "ri", the use of different fonts and the use of different colors. In addition, while the AgVision Mark is more of a standard/customary font usage, the AgriVision Mark uses a custom font and leaves an overall logo impression on the customer due to the position of the letters and elongation of the "A" and "V". The marks also differ in sound in that the AgriVision mark has four syllables and the AgVision mark has three syllables and the overall sounds are different when read aloud. But most importantly, the overall commercial impression of each mark is vastly different. For example, a review of each party's website leaves a completely different impression on the customer. The AgriVision Mark and site leaves its customers with the impression that it is a John Deere dealer offering all equipment and related goods and services for your land needs. The AgVision Mark and site leaves its customers with the impression that it offers grain software or agribusiness software.

Based upon the foregoing, the marks are sufficiently different both in actuality and in commercial practice. In addition, because the AgVision Mark is a weak mark, the differences in the marks do not have to be as great as they would if the AgVision Mark was a strong, distinctive mark.

Factor Three. The third factor is the degree to which the products compete with one another. In your email, you state that each of DMI and the Dealership are using their respective marks for identical purposes of gathering, computing and reporting financial, application, crop and field history data for customers. The Dealership is a John Deere dealership that sells agricultural equipment and machinery to farmers – that is its business. Ancillary to, and as an extremely small component of, its overall equipment sales business, the Dealership is reselling or incorporating technology services provided by John Deere and other providers that enable customers to better utilize or optimize their equipment. Those services are primarily marketed to the Dealership's current customer base in connection with the purchase of farm equipment and are principally sold and marketed from the Dealership's brick and mortar locations. The Dealership's customers are the end users of the equipment.

On the other hand, DMI is a software development company that markets and sells back office software, hardware and support services to suppliers (predominantly grain elevators based upon its website) in order for suppliers to account for, inventory, manage and sell their grain, feed, fertilizer, tree nuts or other products. DMI's customers are suppliers and those suppliers do not come to DMI's brick and mortar location to purchase or learn about its products – they do that on the internet.

We also find it very interesting that you and DMI believe that there is so much overlap between the types of customers served by DMI and the Dealership. A review of DMI's website indicates that farmers are not DMI's target customers. For example, of the 30+ customer





testimonials appearing on the website, none come from farmers and all of them appear to come from grain elevators, seed processors, cooperatives and feed stores. More importantly, until very recently, DMI's website home page did not even mention farmers and noted that its software is used by "grain elevators, seed processors, cooperatives, fertilizer retailers, feed stores, ethanol plants and tree nut processors". According to the Internet Archive WayBackMachine (http://archive.org/web/), sometime after February 7, 2014 (and presumably after your client became aware of the Dealership's use of the AgriVision Mark), DMI's home page was changed to mention that it also provides software to "farms". Copies of the web pages before and after February 7, 2014 are enclosed with this letter. We do not think that this change and the following sequence of events involving your client's complaints are coincidental.

Based upon the foregoing, it is clear that DMI and the Dealership do not offer products that compete with one another. However, we can also rely on the past actions of your client regarding its own trademark registration application to provide definitive proof. As you may be aware, DMI's trademark application was initially suspended due to its likelihood of confusion with a prior application for the Agrovision mark. The application to register the Agrovision mark was made with respect to "computer database software for inventory control of and sales and storage records for agricultural products" and "computer consulting and computer services, namely, providing a computer database for the transfer of data between agricultural product retailers, suppliers and customers". In response to the suspension by the US Patent and Trademark Office, DMI filed a Response to the Office Action arguing against likelihood of confusion on February 16, 1998 (a copy of the Office Action and Response to Office Action are enclosed.). In that letter, DMI's current CEO, Jose Laracuente, stated that "***AgVision and Agrovision are not in conflict and will not be confused in the agribusiness industry. The names sound and look different. Additionally, the companies provide different goods and services.***" DMI continued by stating that there was no conflict between the goods and services offered by each party. Specifically, "AgVision is software for the financial, administrative, inventory and product management of grain, feed, fertilizer, and other agricultural products. On the other hand, Wilfarm's Agrovision is a new service that provides for the transfer of data between agriproduct retailers, suppliers and customers. ***AgVision and Agrovision do not compete with each other.*** In fact, because of AgVision's product type, industry recognition and large client base, WilFarm has contacted us about developing an interface between the AgVision software and WilFarm's EDI services". In light of DMI's own statements with respect to Agrovision, a company that clearly intended to engage in the software business with a much closer connection to AgVision than an equipment dealership, DMI cannot now argue in good faith that the Dealership's use of the AgriVision Mark is confusingly similar.

Fourth Factor. The fourth factor is whether the alleged infringer had an intent to "pass off" its goods as that of the prior trademark owner. The adoption of the AgriVision Mark by the Dealership was a result of the merger of two dealerships which together bring over one hundred years of industry experience. The combined dealership wanted to adopt a name that was different than the prior company names and reflective of a focus on its agricultural customer base and vision for the future of the equipment dealership business. The owners of the Dealership





were not aware of DMI and its software or the AgVision Mark and had no intent of "passing off" its goods as that of DMI. In fact, the Dealership and its goodwill is based upon the long-standing goodwill and customer service of each combined company. It is of paramount importance that each combined dealership's customer base associates the AgriVision Mark with the new combined dealership; confusion and association with another business are contrary to that goal. Lastly, in addition to working with a marketing company to help develop the AgriVision mark, the Dealership took appropriate steps to hire counsel to consult with and apply to register the AgriVision Mark; it was a well thought out process based upon substantiated reasons and purpose that did not include DMI.

Fifth Factor. The fifth factor is whether there have been incidents of actual confusion. Regarding this factor, the Dealership is not aware of any actual confusion and cannot imagine an instance where any of its customers will be confused by its business with that of DMI.

Sixth Factor. The sixth factor is the type of products, their costs and conditions of purchase. The Dealership predominantly offers John Deere products but also offers other short-line products and ancillary services. Its customers come to the Dealership for those specific products when they have a need in their agriculture business and their purchase decisions are not based upon impulse, but rather well-thought out. The costs for some of the equipment and other goods and services can be significant and often require financing. Accordingly, the Dealership customers understand who they are buying from and they buy from the Dealership because they trust the Dealership and its reputation for customer service. DMI is a software developer that licenses software and sells related software and support services to suit its customer's back office accounting and inventory needs. We do not know the cost of the products, but given DMI's customer base is not of a mass market nature we can assume with confidence that the investment in a new overall software and hardware system would be significant in cost and a decision made only after much deliberation. In fact, one customer of DMI stated the following on its website: "We looked on the Internet and considered at least four different systems. We visited with elevators that had the AgVision software, and we were impressed with what they said about it, so we went ahead a made the switch. It's real user-friendly compared to our previous system."

Based upon the above, customers of each of DMI and the Dealership purchase their products based upon specific needs and after much deliberation due to the cost of the products and the need for the product to serve their specific operational needs. Because that is the case, customers will not be confused by the use of either party's marks with their respective and contrasting goods and services.

Due to the facts in this situation that clearly support a finding that the AgriVision Mark is not confusingly similar to the AgVision Mark, I want to reiterate that the Dealership will continue to use the AgriVision Mark and considers this matter closed. Please feel free to contact me if you would like to discuss this issue further.






Nothing contained in this letter may be deemed an admission of any fact or a waiver of any position regarding the law. The statements made herein are based upon the information available to the Dealership at this time. The Dealership reserves its rights to seek such rights and remedies as may be available to it at law or in equity. This letter shall not be admissible in evidence regarding any factual issue that may arise in the event of subsequent litigation.

Sincerely,

Lance Formwalt

LJF:KAZ
Enclosures




http://agvisionsoftware.com BROWSE HISTORY

http://agvisionsoftware.com

Saved **44 times** between July 23, 2001 and February 7, 2014.

**PLEASE DONATE TODAY.** Your generosity preserves knowledge for future generations. Thank you.




## Note

This calendar view maps the number of times http://agvisionsoftware.com was crawled by the Wayback Machine, *not* how many times the site was actually updated. More info in the FAQ.

The Wayback Machine is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form.
Other projects include Open Library & archive-it.org.

Your use of the Wayback Machine is subject to the Internet Archive's Terms of Use.

# AgVision Accounting and Inventory Management Software






Download our brochure

**Established in 1976**, AgVision is an industry leader in developing powerful accounting and inventory management software for agribusiness. Several hundred grain elevators, seed processors, cooperatives, fertilizer retailers, feed stores, ethanol plants, farms and tree nut processors nationwide are using our products and services.

We represent four generations of accounting, business, technology and agricultural experience and want to help you and your company become more efficient. All of our employees are located here, and all of our software is written in house by our own programmers.

Click here to go to our Software page for more details.

## AgVision Customers Say...

"We looked on the Internet and considered at least four different systems. We visited with elevators that had the AgVision software, and we were impressed with what they said about it, so we went ahead a made the switch. It's real user-friendly compared to our previous system."

**Sheila Helland**
Corn Plus Ethanol, Winnebago, Minnesota
*Customer since March 2006*



# Request More Information

## Want more information about AgVision software?

Simply call us at 800.759.9492 or use our Online Request For Information form.



# Recent News

## The AgVision Windows Payroll Program is available!

March 11, 2014

The AgVision Windows Payroll is written with the most current programming tools. An optional Time Clock Entry Screen can be added so that employees can check in and out for duty directly on the computer Read More >>

Read All News Items

© 2014 AgVision




**DMI Computer Technologies** 1601 N. Ankeny Blvd, Ankeny, IA 50023-4159
515-964-0708 or 800-759-9492

# AgVision Accounting and Inventory Management Software





Download our brochure

**Established in 1976**, AgVision is an industry leader in developing powerful accounting and inventory management software for agribusiness. Several hundred grain elevators, seed processors, cooperatives, fertilizer retailers, feed stores, ethanol plants and tree nut processors nationwide are using our products and services.

We represent four generations of accounting, business, technology and agricultural experience and want to help you and your company become more efficient. All of our employees are located here, and all of our software is written in house by our own programmers.

Click here to go to our Software page for more details.

## AgVision Customers Say...

Of the Commodity Manager: "This was the best harvest I ever had, even with all the drying. I wish we would have converted earlier." And of the Fertilizer Manager: "I've put hundreds of mix sheets through the system and it's really cookin'. That's a really nice little system you've got there, and I'm real pleased."

**John Beetz**
Meriden Grain, Mendota, Illinois

*Customer since 1997*



# Request More Information

### Want more information about AgVision software?

Simply call us at 800.759.9492 or use our Online Request For Information form.



# Recent News

### Kansas wheat check-off increases to 2 cents per bushel

October 28, 2013

The increase is effective Nov. 1, 2013. Read More >>

Read All News Items

© 2014 AgVision




**DMI Computer Technologies** 1601 N. Ankeny Blvd, Ankeny, IA 50023-4159
515-964-0708 or 800-759-9492

INTERNET ARCHIVE
WayBackMachine
http://www.agvisionsoftware.com/
Go
44 captures
23 Jul 01 - 7 Feb 14
MAY JUL FEB
28
2012 2013 2014

# AgVision Accounting and Inventory Management Software






Download our brochure

**Established in 1976**, AgVision is an industry leader in developing powerful accounting and inventory management software for agribusiness. Several hundred grain elevators, seed processors, cooperatives, fertilizer retailers, feed stores, ethanol plants and tree nut processors nationwide are using our products and services.

We represent four generations of accounting, business, technology and agricultural experience and want to help you and your company become more efficient. All of our employees are located here, and all of our software is written in house by our own programmers.

Click here to go to our Software page for more details.

## AgVision Customers Say...

"We tried another grain software first, but it was complicated and wasn't user-friendly. We found out very quickly that if the grain bookkeeper isn't comfortable with the software, then you have problems."

**Gary Wrede**
Consumers Cooperative Society, Coralville, Iowa
*Customer since November 1985*



## Request More Information

### Want more information about AgVision software?

Simply call us at 800.759.9492 or use our Online Request For Information form.



## Recent News

### AgVision will be closed Thursday, July 4, for Independence Day.

July 3, 2013

We will reopen Friday, July 5, at 8 a.m. for regular business hours. Read More >>

Read All News Items

© 2013 AgVision




**DMI Computer Technologies** 1601 N. Ankeny Blvd, Ankeny, IA 50023-4159
515-964-0708 or 800-759-9492




AgVision

WHEN YOUR ONLY OPTION IS SUCCESS

LO\103

2

February 16, 1998

Assistant Commissioner for Trademarks
2900 Crystal Drive
**ATTN: Mark Sparacino**
Trademark Attorney
Law Office 103
Arlington, VA 22202-3513

TRADEMARK LAW OFFICE 103
Serial Number: 75/296569
Mark: AGVISION
**Please Place on Upper Right Corner**
**of Response to Office Action ONLY **

RE: **Serial Number 75/296569 - AgVision**

Dear Mr. Sparacino:

As a follow up to our phone conversation last week, I have enclosed three xeroxed copies of an **AgVision** Software diskette which I am submitting as substitute specimens. In addition, this letter addresses your concerns regarding a possible conflict with another pending application, namely Agrovision.

I believe that the names **AgVision** and Agrovision are not in conflict and will not be confused in the agribusiness industry. The names sound and look different. Additionally, the companies provide different goods and services.

RECEIVED 98 FEB 27 P 6:23 T.M.E.O. LAW OFFICE 103

**AgVision** has been in active commercial use since mid-1992 and has earned strong name recognition in the agribusiness industry. Currently, there are nearly 500 clients in over 24 states using **AgVision** software systems. **AgVision** is a recognized member of many state and national agribusiness associations and is a regular participant at industry trade shows. For your benefit, I have enclosed a copy of a page from the *National Grain and Feed Association (NGFA) 1997-98 Directory Yearbook* listing of "Computer Sales/Service/Software Developers". Please note that **AgVision** is listed but Agrovision is not. I am also enclosing a May 1997 article appearing in *Grain Journal* magazine featuring our **AgVision** software.

Concerning goods and services, again, there is no conflict. **AgVision** is software for the financial, administrative, inventory and product management of grain, feed, fertilizer, and other agricultural products. On the other hand, Wilfarm's Agrovision is a new service that provides for the **transfer of data between** agriproduct retailers, suppliers, and customers. **AgVision** and Agrovision do not compete with each other. In fact, because of **AgVision's** product type, industry recognition and large client base, WilFarm has contacted us about developing an interface between the **AgVision** software and WilFarm's EDI services.

**1601 North Ankeny Boulevard • Ankeny, Iowa 50021**
**Phone: (515) 964-0708 • Fax: (515) 964-0473**

Please call me at (515) 964-0708 if you need any additional information or have any questions. I look forward to hearing from you soon.

Sincerely,

José M. Laracuente
Executive Vice President

Attachments:

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**

| SERIAL NO. / APPLICANT | | PAPER NO. |
|---|---|---|
| 75/296569 Dairyland Midwest Inc. | | |
| MARK: AGVISION | | ADDRESS: Assistant Commissioner for Trademarks 2900 Crystal Drive Arlington, VA 22202-3513 |
| ADDRESS: DAIRYLAND MIDWEST INC 1601 N ANKENY BLVD ANKENY IA 20021 | ACTION NO. 01 | If no fees are enclosed, the address should include the "Box Responses - No Fee." |
| | MAILING DATE 02/09/98 | Please provide in all correspondence: |
| FORM PTO-1525 (5-90) U.S. DEPT. OF COMM. PAT. & TM OFFICE | REF. NO. | 1. Filing Date, serial number, mark and Applicant's name. 2. Mailing date of this Office action. 3. Examining Attorney's name and Law Office number. 4. Your telephone number and ZIP code. |

**A PROPER RESPONSE TO THIS OFFICE ACTION MUST BE RECEIVED WITHIN 6 MONTHS FROM THE DATE OF THIS ACTION IN ORDER TO AVOID *ABANDONMENT.*** *For your convenience and to ensure proper handling of your response, a label has been enclosed. Please attach it to the upper right corner of your response. If the label is not enclosed, print or type the* Trademark Law Office No., Serial No., *and* Mark *in the upper right corner of your response.*

RE: Serial Number: 75/296569

The assigned examining attorney has reviewed the referenced application and determined the following.

**Search of Office Records**
The examining attorney has searched the Office records and has found no similar registered mark which bars registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). TMEP section 1105.01. Please note that the examining attorney has found a potentially conflicting pending application.

**Prior Pending Application**
The examining attorney encloses information regarding pending Application Serial No. 75/272232. The filing date of the referenced application precedes the applicant's filing date. There may be a likelihood of confusion between the two marks under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). If the referenced application matures into a registration, the examining attorney may refuse registration in this case under Section 2(d). 37 C.F.R. Section 2.83; TMEP section 1208.01.

If the applicant believes that there is no potential conflict between this application and the earlier-filed application, the applicant may present arguments relevant to the issue. The applicant's election to present or not present arguments at this time will not affect the applicant's right to present arguments later. Action on this application will be suspended pending the disposition of Application Serial 75/272231, upon receipt of the applicant's response resolving the following informality.

**Specimens**

The specimens are unacceptable as evidence of actual trademark use because they do not show use of the mark for the goods identified in the application. Invoices, announcements, order forms, bills of lading, leaflets, brochures, publicity releases and other printed advertising material generally are not acceptable specimens. *In re Bright of America, Inc.*, 205 USPQ 63 (TTAB 1979); TMEP sections 905.05 and 905.07. *See In re Ultraflight Inc.*, 221 USPQ 903 (TTAB 1984). A computer disc is an acceptable specimen if it is in use in commerce. A computer disc that is a "sample only" is not in use in commerce and therefore is not an acceptable specimen. The applicant must submit three specimens showing the mark as it is used in commerce. 37 C.F.R. Section 2.56. Examples of acceptable specimens are tags, labels, instruction manuals, containers, and photographs that show the mark on the goods or packaging. The applicant must verify, with an affidavit or a declaration under 37 C.F.R. Section 2.20, that the substitute specimens were in use in commerce at least as early as the filing date of the application. 37 C.F.R. Section 2.59(a); TMEP section 905.10.

If the substitute specimens show that the applicant places the mark on the goods in a different manner than that stated in the method-of-use clause, the applicant must also amend the method-of-use clause to indicate the type of use shown on the substitute specimens. Trademark Act Section 1(a)(1)(A), 15 U.S.C. Section 1051(a)(1)(A); 37 C.F.R. Section 2.33(a)(1)(x); TMEP section 905.09. For example, if the applicant submits labels, the applicant must amend the method-of-use clause to state that "the mark is used on labels."

**Response Guidelines**

No set form is required for response to this Office action. The applicant must respond to each point raised. The applicant should simply set forth the required changes or statements and request that the Office enter them. The applicant must sign the response. In addition to the identifying information required at the beginning of this letter, the applicant should provide a telephone number to speed up further processing.

In all correspondence to the Patent and Trademark Office, the applicant should list the name and law office of the examining attorney, the serial number of this application, the mailing date of this Office action, and the applicant's telephone number.

If the applicant has any questions or needs assistance in responding to this Office action, please telephone the assigned examining attorney.

Mark Sparacino
Trademark Attorney
Law Office 103
703-308-9103 ext 115

*** User: EX397517 *** Se~ial Number: 75272231 ***

Word Mark
AGROVISION

Goods/Services
IC 009; US 021 023 026 036 038; G & S: computer database software for inventory control of and sales and storage records for agricultural products

Goods/Services
IC 042; US 100 101; G & S: computer consulting and on-line services for the transfer of data between agricultural product retailers, suppliers and customers

Mark Drawing Code
(1) TYPED DRAWING

Serial Number
75-272231

Filing Date
1997.04.10

Owner Name/Address
(APPLICANT) WILFARM, L.L.C. CORPORATION MISSOURI 5401 North Oak Trafficway Gladstone MISSOURI 641180190

Type of Mark
TRADEMARK; SERVICE MARK

Register
PRINCIPAL

*** Search: 2 *** Document Number: 4 ***